# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JAMES STANGO,

               Plaintiff,

  v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

               Defendant.

3:14-cv-01007 (CSH)

## RULING ON PLAINTIFF'S MOTION FOR REVERSAL OR REMAND AND DEFENDANT'S CROSS-MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

HAIGHT, Senior District Judge:

Plaintiff James Stango applied to the Social Security Administration (the "SSA") for disability benefits and supplemental security income after sustaining injuries in a motorcycle accident on April 2, 2011. The SSA denied Stango's application in a written decision on May 31, 2013 (Kim K. Griswold, *Administrative Law Judge*) which the Defendant Commissioner affirmed on appeal.

Stango brings this action under § 205(g) of the Social Security Act as amended, 42 U.S.C. § 405(g), in order to obtain a review by the Court of the Commissioner's final decision denying his applications for benefits. Stango now moves for an order reversing the Commissioner's decision.[1] Doc. 22. For its part, the Commissioner cross-moves for an order affirming that decision. Doc. 27. This Ruling resolves the motions.

---

[1] The Court notes for the record that Stango's 50-page memorandum of law is in violation of D. Conn. L. Civ. R. 7(a)(2) and this District's Standing Scheduling Order for social security cases [Doc. 3], which limit briefs to 40 pages.

I.     **Background**[2]

Plaintiff Stango was born on May 20, 1968.  On April 2, 2011, when he was almost 43 years old, Stango was hit by an automobile while riding his motorcycle, leading to significant injuries.  At the core of the present dispute are Stango's allegations that those injuries —and their concomitant symptoms—constitute a "disabling condition" that render him "unable to work."  AR. 175.

It is indisputable that Stango's accident set in motion a lengthy and arduous recovery process, which started immediately following the accident upon admission to the emergency room at the Waterbury Hospital, in Waterbury, CT.  Waterbury later determined that Stango had suffered "a significant contusion and abrasions of the right leg, sprains of both ankles, sprains of both knees and a small finger metacarpal-based fracture, nondisplaced, left hand."  Administrative Record[3] ("AR.") 257.  Waterbury provided Stango with an orthopedic consultation and a trauma consultation, and told Stango to follow up with an orthopedic specialist.  AR. 312.  Stango was discharged from Waterbury on April 5, 2011.  However, he returned to, and was readmitted by, the Waterbury emergency room on April 9, 2011 after developing swelling and redness in his right leg.  AR. 257.  Stango was released on April 11, 2011, but returned yet again on April 15, 2011 after experiencing "severe pain" due to a left leg hematoma.  AR. 373-74.  At that visit, Stango was prescribed oxycodone, a pain killer.  *Id.*  On April 18, 2011, Stango returned to Waterbury for an initial orthopedic consultation

---

[2]  This background section is largely taken from Stango's memorandum of law, [Doc. 23], at 4-30, but also relies on the ALJ's decision, AR. 13-21, and the Court's own review of the Administrative Record.  The Commissioner did not offer a counter-statement of facts, nor did it specifically object to Stango's description of the facts.  *See* Doc. 27-1, at 2.  This is despite the fact that Magistrate Judge Margolis informed the Commissioner that if it disagreed with Stango's description of the facts it should do so by "specifically indicating any material omissions or areas of disagreement . . . with record citations."  Doc. 16.  The Commissioner did not do so.

[3]  The Administrative Record can be found at Docs. 14-1 through 14-11.

with Dr. Robert S. Wetmore.  AR. 343.  Dr. Wetmore noted the following:

> [Stango] states he is in excruciating pain which he describes as
> "extreme."  He complains of his thumb and index finger on the right
> side causing pain, he complains of his left hand and wrist, he
> complains particularly of his left knee over the medial side, he
> complains of less pain in the right knee, and finally he complains of
> pain in both feet and ankles.  With regards to the right calf, he states
> he had a hematoma and points to a red and swollen area on the medial
> side of the calf.

*Id.*  Nevertheless, Dr. Wetmore interpreted a CT scan to show "no other abnormalities" other than

Stango's left hand fracture, that Stango's "multiple contusions and sprains . . . appear to be stable,"

and that "there is no obvious damage to the lower legs that should require use of a walker." AR. 345.

Stango visited Dr. Wetmore again on May 16, 2011, at which time Dr. Wetmore referred Stango to

"physical therapy for modalities and exercises for his cervical and lumbar strain." AR. 594.  On May

18, 2011, Stango returned again to the Waterbury emergency room after falling at home after a spout

of dizziness.  AR. 380.  Stango complained that he aggravated his left hand injury during the fall,

and also that "he has been having headaches and dizziness since [the] accident," as well as

"continued neck and back pain." AR. 381.

On May 19, 2011, Stango began physical therapy at Access Rehab Centers in Southbury, CT.

AR. 392.  Physical therapist Mary Beth Olan's initial evaluation of Stango noted a limited range of

lumbar and cervical motion, that Stango's gait was "guarded and slow," and that his "lower calf is

swollen, slightly red." AR. 393.  Stango also complained of "headaches, dizziness and shooting

pain down his legs." AR. 389.  Stango continued to receive physical therapy multiple times per week

at Access Rehab through July 27, 2012 (at which time he was still complaining about "the headaches

and dizziness with stress, exercise and changing position").[4]  AR. 674.

On May 27, 2011, Stango visited internist Dr. Stephen Rossner at the Staywell Health Center in Waterbury, CT for a follow-up exam.  AR. 300.  At this time, Stango was experiencing backache, joint pain, headaches and "reactive confusion."  AR. 300.  Following a "review of systems," Dr. Rossner found minimal issues with Stango, and assessed him only with "low back pain[,] headaches," and told Stango to schedule another follow-up appointment in 6-8 months.  AR. 302.[5]

On June 20, 2011, Stango had a follow-up appointment with Dr. Wetmore.  Dr. Wetmore stated that Stango's leg injury—what Dr. Wetmore determined to be a "right post tibial degloving injury"—was "doing well at this point."  AR. 620.  He also ordered physical therapy for Stango's left ankle neuroma (nerve-swelling) and provided for a refill of his physical therapy prescription as to his cervical and lumbar pain, which Stango said was "helping tremendously."  AR. 621.

On June 28, 2011, Stango visited the emergency room at the Yale-New Haven hospital complaining of headaches, neck, and back pain and seeking a second opinion than that of the Waterbury Hospital.  AR. 278.  The hospital diagnosed Stango with "post-concussion syndrome," which "is marked by the following symptoms:  persistent headache, dizziness, weakness, insomnia, and feeling nervous or depressed."  AR. 298.  The hospital also performed a CT scan of Stango's

_____

[4]  The Administrative Record contains dozens of daily physical therapy reports from staff at Access Rehab.  *See* AR. 386-426, 642-912.  It is not feasible for the Court to document the substance of each of those reports here.  It is sufficient to say that Stango's condition vacillated, in that he expressed on various days "severe pain," while at others appeared to be in relatively good condition.

[5]  Stango returned to Staywell on July 20, 2011, complaining of a "large, painful mass on his mid-back which has appeared in the past few months after a motorcycle accident and seems to be growing."  AR. 304.  The treatment notes indicate that they would "call patient with results" of testing, but nothing in the record indicates anything further.  AR. 306.

brain and cervical spine, which showed no abnormalities.  AR. 434.  Stango was released the same

day with the recommendation that he seek further evaluation from a "neurologist/headache

specialist."  AR. 298.[6]

On July 7, 2011, Stango was seen for a neurology office visit with Dr. Stephen P. Novella

of the Yale Neurology Clinic.  AR. 430.  Dr. Novella noted that Stango was "referred for evaluation

of headaches," and stated that:

> Since accident, pt has had nearly daily HAs.  Pain originates from
> base of skull and radiates over scalp, 10/10, throbbing, sometimes
> associated with photophobia, no nausea or vomiting.  Initially, HAs
> were not severe or noticeable due to more intense pain from back and
> knees.  Now that those pains have subsided HAs are more noticeable.
> He has been to Waterbury Emergency Department about 4x for HA
> management. . . .  Last week he came to YNHH Emergency
> Department due to severe HA. . . .  Several hours later he again
> developed severe HA.  He realized at that point that palpation of neck
> muscles are triggers for HAs.  Other triggers include stress and
> sudden movements.  Of note, the CT head/cspine study was
> unremarkable.

AR. 430.  Dr. Novella then provided his assessment:

> Description of HAs is suggestive of cervicogenic HAs.  This is
> reinforced by pain to hypertrophied posterior neck muscles.  He only
> takes oxycodone sporadically within a month and so there may not be
> component of analgesic overuse HA.  Nevertheless, oxycodone is not
> the correct treatment for this type of pain.  We will initiate Amrix
> 30mg QHS and recommend to continue PT neck stretching exercises.

AR. 432.  Stango visited Dr. Novella again on September 27, 2011, at which time Dr. Novella noted

that Stango "responded well to trial of Amrix, but had recurrence [of headaches] after trial

completed," and that the headaches "should improve with time.  In the interim, will give another

prescription for amrix as well as antiinflammatory (naproxen)."  AR. 429.

---

[6]  The ALJ's decision makes no reference to this visit to the Yale-New Haven Hospital.

At his July 5, 2011 physical therapy session, Stango informed his therapist that "my head feels like its going to explode," and that his level of pain was a 10 out of 10.  AR. 412.  However, he reported "feeling better" at his following appointment on July 7, 2011.  AR. 411.

On October 2, 2011, Stango had a follow-up orthopedic visit with Dr. Wetmore.  Dr. Wetmore noted that Stango:

> now complains of pain over the previous fracture of the left fifth metacarpal as well as weak hand grips and inability to open jars, etc. due to pain in all five fingers of both hands.  He states that he feels he is doing well in physical therapy although the therapist stated to him that he should be moving along faster.  He wishes to return to light duty work as he has court ordered community service he needs to pay back.

AR. 628.  Dr. Wetmore noted that "[w]e have given him a note to return to light duty to look for work of that nature. . . .  He will wear TED stockings to the lower extremities to avoid swelling while he is standing for that work time.  He otherwise will rest and attend his physical therapy."  AR. 628-29.

On October 17, 2011, Stango visited Dr. Mary I. Miller, an internist in Southbury, CT.  Dr. Miller noted that Stango was in "chronic pain," had edema on the right leg, had issues with dizziness, was experiencing lower back pain up to his neck, and had shooting pains in his leg.  AR. 440.

On November 14, 2011, Stango had another orthopedic appointment with Dr. Wetmore, following which Dr. Wetmore stated as follows:

> Subsequent to [Stango's accident] he has had multiple complaints in the clinic including knee pain, low back pain, neck pain, headaches and other vague migratory symptoms.  He became very frustrated with the "system" because he was "not getting better."  He is particularly hostile today but we have had a long talk in which I have explained that often in musculoskeletal trauma there can be chronic pain without obvious objective findings. . . .  Based on his diffuse and vague symptoms I would not order any special test as this time.

AR. 630.  Dr. Wetmore then provided his ultimate assessment:

> Significant psychosocial disruption and disability associated with multiple trauma, limited ability to work, and chronic pain syndrome. I have suggested that perhaps that he add to his armamentarium of treating clinicians a physiatrist.  This may help address the programs to deal with his vague musculoskeletal complaints.  I have suggested activity such as exercise, stretching and yoga might be of benefit.  He is going to start seeing Dr. Mary Miller for primary care physician and he may benefit from that management as well.  There is no further need to come to orthopedic clinic.

AR. 630.

On February 6, 2012, Stango made his first visit to podiatrist Dr. Joel S. Segalman of the Chase Parkway Podiatry Group, who Stango visited nine more times over the subsequent four months.  AR. 443.  Dr. Segalman diagnosed Stango with "severe achilles tendonitis and [right] equinus deformity."  AR. 446.

On March 6, 2012, Stango was evaluated by Drs. Gordon Frank Buchanan and Gioacchino Curiale, neurologists at the Yale-New Haven Hospital.  AR. 454.  Their exam did not find any neurological abnormalities.  Although they documented that Stango experienced an "exacerbation of headaches and pain" after running out of Amrix and Nortriptyline, they also noted that "Patient otherwise reports that he is feeling much better with physical therapy and balance therapy. . . .  He feels that he is getting back to baseline, but not there yet.  His headaches are milder now, tolerable, but still almost daily.  He attributes his pain to his muscles being out of alignment."  AR. 454.

On June 8, 2012, Stango had MRIs taken of his left shoulder and cervical spine by Dr. Andrew J. Lawson of Cerner Imaging. The only abnormality reported as to Stango's left shoulder was that "[t]here are moderate hypertrophic degenerative changes of the acromioclavicular joint.  There is mild narrowing of the subacromial space.   There is a small amount of fluid within the

subacromial/subdeltoid bursa." AR. 642. As to the spine, the MRI showed several instances of "mild loss of disk signal," a "small broad disk bulge," and a "slight flattening of the spinal cord anteriorly." AR. 643.

On August 1, 2012, in light of a referral from Dr. Jocelyn Maw of Alliance Medical Group in Middlebury, CT, Stango was evaluated by Dr. Alexandru Dinu at the Gaylord Outpatient Center in Wallingford, CT. Stango described his symptoms to Dr. Dinu as including: cervical spine pain, headaches, dizziness, shoulder and neck problems, difficulties with ambulation due to loss of balance, difficulties with memory, concentration and mood, trouble sleeping, anxiety, swelling in his legs, intolerance to heat, and nerve pain. Dr. Dinu's diagnostic impression was ultimately that Stango was suffering from the following: (i) status post motorcycle accident with postconcussion syndrome; (ii) chronic headaches; (iii) posttraumatic stress disorder; (iv) myofacial pain syndrome; (v) mobility defects; and (vi) uncontrolled hypertension. Dr. Dinu concluded that Stango's "symptoms are probably a resultant of postconcussive syndrome and posttraumatic stress disorder." AR. 921. Dr. Dinu also noted, however, that Stango's "[l]ower extremities present full range of motion. Strength is 5/5 on both sides. Deep tendon reflexes 1+. No gross sensory defects. He has difficulties maintaining balance with 1-legged standing. Gait is normal." AR. 921. Stango then underwent aquatic therapy at Gaylord, which was deemed to be of assistance in light of the fact that Stango's "daily activities and gait are limited." AR. 931. On September 14, 2012, Gaylord physical therapist Susan Goldstein reported Stango's "Current Level of Function" as follows: "unable to work, pain, pt does some stretches, drives, gardens a little, diff to read, no biking due to cervical strain." AR. 934.

On October 27, 2012, Dr. Maw responded to interrogatories regarding Stango's headaches,

and stated, *inter alia*, that: (i) at least twice a week Stango suffers from severe headaches that interfere with his daily activities (noting that he "need[s] to lie recumbent & undisturbed until headache subsides"); (ii) that the headaches are associated with dizziness, vertigo, photophobia, and noise sensitivity; (iii) that Stango can carry on a conversation and activities of daily living while a headache is occurring;[7] and (iv) the headaches have not been resistant to treatment.  AR. 441.

On November 7, 2012, Stango again visited Dr. Dinu at the Gaylord Outpatient Center.  Dr. Dinu noted that Stango "has been improving with physical therapy and speech," and that he "needs to have a functional capacity evaluation in order to be able to work in the near future."  AR. 924.

On November 26, 2012, Stango again visited Dr. Segalman at the Chase Parkway Podiatry Group.  Dr. Segalman noted that Stango's chief complaint was "severe pain in b/l ankle," and noted that "Patient complains today of discomfort in shoes, difficulty in walking and irritation.  Pain at right heel and left heel."  AR. 973.  Overall, Dr. Segalman noted that Stango's "chief complaint(s) are resolving."  AR. 974.  Nevertheless, on December 4, 2012, Dr. Segalman drafted a "letter of medical necessity" stating that Stango requires an AFO orthotic, specifically, "long-term mechanical control of the pathological Subtalar Joint as the primary treatment methodology."  AR. 982.  Dr. Segalman stated that the orthotic devices "represent the only practical, long-term means by which

---

[7]  Plaintiff mischaracterizes Dr. Maw's interrogatories by stating that Dr. Maw reported that "Mr. Stango is unable to carry on a conversation or carry on with activities of daily living when he has a headache."  Doc. 23, at 24.  In fact, Dr. Maw stated just the opposite.  She answered "Yes" to the questions "Is the patient able to carry on a conversation when (s)he has a headache?" and "Can patient carry out activities of daily living while a headache is occurring?"  AR. 441.  However, this may have been a clerical error, in light of Dr. Maw's opinion that Stango reported "that headaches interfere with carrying out daily activity" (and that Stango's descriptions are "consistent with clinical findings").  AR. 441.

to effectively treat [Stango's] acute complaints," and that without such, surgery would be required.[8]

Stango had a further visit with Dr. Segalman on January 28, 2013, in which Stango made the same

complaints, but after which Dr. Segalman noted that Stango's "chief complaint(s) are improved."

AR. 976.

On February 6, 2013, Stango visited Dr. Dinu at Gaylord for a third time.  Dr. Dinu noted

that "a 10+ review of systems is negative," but documented a myriad of complaints from Stango,

specifically: "dizziness, muscle spasms, numbness, muscle pain, swelling in the legs, occasional

migraines/headaches, trouble hearing, intolerance for heat, loss of balance, double vision, difficulties

with ambulation, difficulties with memory, concentration and falling and staying asleep, back pain,

nerve pain." AR. 926.  Dr. Dinu's ultimate diagnostic impressions were that Stango was suffering

from "[l]ate effects of traumatic brain injury with postconcussion syndrome,"; "[c]hronic ankle pain";

and "[m]ild cognitive defects."  AR. 927.

On February 18, and February 22, 2013, Stango again visited Dr. Segalman, who noted that

Stango's pain is "on and off," and that his "chief complaint(s) are well-controlled."  AR. 977-80.

Finally, on March 29, 2013, Dr. Segalman responded to a series of questions, stating that, *inter alia*:

(i) Stango "suffer[s] from post traumatic changes to soft or connective tissue, vascular changes, or

arthritis of a major weight-bearing joint (1.03) [his ankles/feet]"; (ii) Stango is limited in motion; (iii)

there is no "gross anatomical deformity"; (iv) Stango is limited in his ability to sit, walk, and stand;

---

[8]  The record does not make entirely clear whether Stango in fact secured orthotics.  It
appears that he may not have as of the last recorded visit to Dr. Segalman on February 22, 2013.
On that date, it appears Dr. Segalman "discussed orthotics" with Stango, but there is no mention
as to whether he obtained them.  AR. 980.  At the March 26, 2013 hearing, Stango testified that
Dr. Segalman did not give him orthotics but that he had recently ordered a "night splint" for both
feet.  AR. 41.  Stango also testified that he had been fitted for the orthotics.  AR. 47.

(v) Stango must move, change position, or stretch for 5 to 10 minutes when sitting with feet on the floor for 10 to 15 minutes; (vi) Stango's gait is unstable; (vii) a handicapped parking sticker is appropriate; (vii) Stango experiences "chronic ankle and foot pain"; (viii) treatment does not completely eliminate all pain; and (ix) Stango's "complaints have been consistent with physical examination findings & radiology studies over time." AR. 984.

## II.   Procedural History

On July 8, 2011, three months after his accident, Stango submitted his application for DIB and SSI with the SSA.[9]  AR. 173-190.  Stango alleged the following impairments as part of his applications: (i) broken left hand; (ii) injuries to ankles and knees; (iii) back and neck pain; (iv) migraine headaches; (v) right leg swelling; (vi) hips coming out of alignment; (vii) dizzy spells; and (vii) blurry vision.  AR. 65.  The SSA denied Stango's applications in a written notice on November 17, 2011.[10]  AR. 97-100.  The SSA affirmed that decision on reconsideration in a written notice dated February 3, 2012.  AR. 103-09.  On February 6, 2012, Stango requested a hearing by an ALJ, AR. 110-11, which was scheduled for the following March.  Prior to the hearing,[11] Stango submitted a Pre-Hearing Memorandum.  AR. 246-51.

On March 26, 2013, the SSA held the hearing in front of ALJ Griswold, at which the ALJ took the testimony of Stango and vocational expert Dr. Steven Sachs.

[9]  The ALJ's decision incorrectly states that Stango's applications were made on June 27, 2011.  AR. 10.

[10]  The SSA stated its reason for the denial as follows:  "Although your condition is currently severe, it is expected to improve and will not result in significant limitations in your ability to perform basic work activities.  We have determined that your condition is not expected to remain severe enough for 12 months in a row to keep you from working."  AR. 97.

[11]  It is unclear the date Stango submitted the Pre-Hearing Memorandum.  The first page is dated March 25, 2013, AR. 246, but the signature page is dated March 18, 2013, AR. 251.

At the hearing, Stango testified as to his past work experience, specifically, that he had been a toolmaker for many years, which involved a fairly high level of physicality. Stango then discussed his injuries and their concomitant symptoms. When asked precisely what keeps him from working, Stango testified as follows:

> On a daily basis it's a struggle. I get headaches every day, my neck goes into spasms, my back goes into spasms. I have severe ankle pain. There's dizziness issues, light issues, balance issues. I have trouble maintaining my doctor's appointments. I have trouble keeping things organized. I used to be very, very organized and that's not the case anymore. A great deal of difficulty even walking around doing my household chores. If it wasn't for my son I would need other care.

AR. 40. He testified that he can drive. AR. 40. However, he also testified that he has been "terribly light sensitive ever since the accident," which was because "the neuro pathways are damaged from the eye to the brain, and there was a bruise on [his] eye." AR. 43. In fact, he testified that visual focusing is difficult such that even "[t]he wrong color Christmas paper sets [him] off." AR. 49-50. He testified that "both ankles swell up pretty dramatically throughout the day, and that limits [him] severely," requiring him to get up and move. AR. 46. The swelling takes place "[f]rom my ankle to the top of my foot, that pathway . . . where all the tendons go." AR. 47. Stango also testified that he has trouble sleeping, including having "weird dreams about motorcycles." AR. 48. He is "very, very sensitive to hot and cold," which at times feels "like somebody beat [him] with a baseball bat on [his] neck." AR. 50. He testified that he now has an unreliable grip, as well as pain and cramps in his left hand, which causes him to frequently drop things and creates difficulties at times with writing. AR. 38-39, 50-51.

Stango compared his current level of activity with his pre-accident level of activity. He testified that he used to be a "very, very active, outdoors person. I did a lot of hiking, mountain

biking, knee boarding, water skiing, all of that stuff.  Right now I haven't been on my mountain bike in about a year-and-a-half, sad to say."  AR. 48.  He no longer owns a motorcycle and cannot mow the lawn as he used to.  AR. 48-49.  He also claims to have gained 50 pounds since the accident, and that he has "[t]rouble tying [his] shoes, you know, getting up, doing the laundry, all that stuff.  Cooking, cleaning, doing dishes is a chore."  AR. 49.

Stango was asked about his statements to certain doctors that he had been improving.  Stango explained that there have been "dramatic ups and downs" and that it's"really hard to judge" because "as I get more active, as I do the treatments it gets better[, b]ut then I get more active and I find out how far I really have to go, you know.  It's different every day."  AR. 46.  Stango then provided a recent example: "Just last week I was dusting in my living room and I pinched, felt like a snapping in my neck and I was down for four days, you know, from carrying a feather duster."  AR. 46.

Stango also testified as to his rigorous schedule of doctor's appointments.  He does physical therapy three times a week at Gaylord, which involves three sessions each on those days, for cognitive therapy,[12] physical therapy, and pool therapy.  AR. 41-42.  Further, because of the location of Gaylord's facilities, those three daily sessions take place in different locations.  Additionally, every week he has "a different doctor's appointment just about.  My regular internal, my medical doctor, my primary care doctor is once every three months.  I see the podiatrist once every three weeks."  AR. 40-41.

On May 31, 2013, ALJ Griswold issued a 14-page written decision upholding the denial of benefits (elaborated upon below), AR. 10-23, which the SSA Appeals Council affirmed in a letter dated May 14, 2014, AR. 1-4.  On July 14, 2014, the instant application for review of the SSA's

---

[12]  Stango testified that he stopped the cognitive therapy due to cost concerns.  AR. 42.

decision was timely filed in this Court pursuant to 42 U.S.C. § 405(g).

**III.    The ALJ Decision**

The ALJ's decision followed the familiar five-step procedure for the SSA's evaluation of

disability claims, outlined in 20 C.F.R. § 404.1520.  As described by the Second Circuit, that

procedure is as follows:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in Appendix
> 1 of the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider him disabled without considering
> vocational factors such as age, education, and work experience ....
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has
> the residual functional capacity to perform his past work. Finally, if
> the claimant is unable to perform his past work, the [Commissioner]
> then determines whether there is other work which the claimant could
> perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467

(2d Cir. 1982)).[13]

At *Step One*, the ALJ determined that Stango had not been engaged in substantial gainful

_____

[13]  With respect, the description of the third inquiry in this quotation from *Rosa* is not
entirely accurate.  The third step of the five in the process is described in the SSA regulations as
follows:

> At the third step, we also consider the medical severity of your
> impairment(s).  If you have an impairment(s) that *meets or equals* one
> of our listing in appendix 1 of this subpart and meets the duration
> requirement, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4)(iii) (emphases added).

activity since April 2, 2011, the date of the accident.  AR. 13.

At *Step Two*, the ALJ found that Stango suffered from three "severe" impairments: (i) "right lower extremity traumatic degloving injury and vertigo"; (ii) "fractured left 5ᵗʰ metacarpal, post traumatic myofascial pain syndrome"; and (iii) "lumbar degenerative changes."  The ALJ found that the following purported ailments did not constitute "severe" impairments: "claimant's cervicogenic headaches, memory loss, blurry vision, post traumatic stress disorder, depression, history of right knee arthroscopy, overweight (body mass index 'BMI' 27), right foot Achilles tendinitis and equinus deformity."  AR. 14-16.  The ALJ also separately rejected as "mild," rather than "severe," Stango's "medically determinable mental impairment of post-concussion syndrome, depression and post traumatic stress disorder."  AR. 15.  In making that finding, the ALJ determined that Stango had only mild or no limitation as to the four relevant "broad functional areas" which the Regulations direct the ALJ to consider as to mental disorders.[14]  AR. 15-16.

At *Step Three*, the ALJ found that none of the impairments which she determined to be severe were "equivalent in severity to the criteria of any listed impairment, individually or in combination," as listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR. 16.  Specifically, the ALJ considered the following Listings:  1.02 (major joint dysfunction), 1.03 (joint surgery), 1.04 (spine disorders), 11.18 (cerebral trauma) and 11.00 C (disorganized motor function).

Having not been deemed disabled at Step Three, the ALJ then assessed Stango's Residual Functional Capacity ("RFC"), which she determined to be as follows:

> [C]laimant has the residual function capacity to perform sedentary

---

[14]  Specifically, § 12.00C of 20 C.F.R., Part 404, Subpart P, Appendix 1, directs the SSA to review claimants "activities of daily living," "social functioning," "concentration, persistence or pace," and "episodes of decompensation."

work . . . except the claimant can the claimant [*sic*] can lift and carry up to 10 pounds, stand and walk 2 hours of an 8 hour work day and sit up to 6 hours of an 8 hour workday.  The claimant can perform frequent handling and fingering.  He cannot perform overhead work with his bilateral upper extremities (due to chronic myofascial pain).  The claimant can occasionally stoop and climb ramps and stairs.  The claimant cannot crouch, crawl, kneel, balance or climb ladders, ropes and scaffolds.  The claimant cannot be exposed to vibration or hazards, such as dangerous moving machinery and unprotected heights.  The claimant can tolerate occasional exposure to extreme heat and cold and occasional exposure to sunlight with the use of sunglasses.  The claimant can tolerate exposure to fluorescent lights with the use of tinted glasses or tinted safety glasses.  He can understand, remember and carry out simple routine and repetitive tasks throughout an ordinary workday and workweek with normal breaks on a sustained basis.

AR. 16-17.  The ALJ concluded such to be Stango's RFC in light of the medical evidence available to her, while casting doubt on "the claimant's [testimonial] statements concerning the intensity, persistence and limiting effects of [his] symptoms," which she determined were "not entirely credible."  AR. 18.  The ALJ also gave "no weight" to one of Stango's treating physician's, Dr. Jocelyn Maw, because Dr. Maw did "not offer a function-by-function assessment of the claimant's capabilities nor indicate a belief whether the claimant is able to work."  AR. 20.  The ALJ also questioned "some of [Stango's treating podiatrist Dr.Segalman's] assessment," because it was "not consistent with his treatment notes," and thereby was "not given significant consideration."  Further, as she did as to Dr. Maw, the ALJ criticized one of Dr. Segalman's assessments because it did "not offer a function-by-function assessment of the claimant's capabilities nor indicate a belief whether the claimant is able to work."  AR. 20.  However, for reasons that are not divulged, this purported deficiency did not lead the ALJ to give "no weight" to that report.

At *Step Four*, the ALJ then determined that, given the above RFC determination, Stango is unable to perform any past relevant work.  AR. 21.

Finally, however, at *Step Five*, the ALJ held that Stango is not disabled—and therefore is not entitled to benefits—because "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." AR. 21. Specifically, the ALJ identified three jobs that were available to Stango: (i) receptionist; (ii) general office clerk; and (iii) surveillance system monitor. The ALJ therefore upheld the denial of Stango's applications for benefits.

## IV.   **Standard of Review**

Rather than review SSA denials of disability benefits *de novo*, a federal district court in this context serves an appellate function. *See Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). That review proceeds along two lines of inquiry. At the outset, the court must assess whether the ALJ's decision "is based upon legal error." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry*, 675 F.2d at 467). If the court determines the ALJ's decision not to be infected with legal error, it is then for the court to decide whether the ALJ's decision is supported by "substantial evidence." *Id.* "'Substantial evidence' is evidence that amounts to 'more than a mere scintilla,' and has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ornelas-Sanchez v. Colvin*, 2016 WL 374042, at *1 (2d Cir. Feb. 1, 2016).

That order of operations, in which the Court first looks for legal error, is significant. This is because, as the Second Circuit has clarified, an erroneous application of law cannot be overcome by a showing that the "substantial evidence" standard has purportedly been met:

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) ("the Court must first review the ALJ's decision for correct legal principles before applying the substantial evidence standard to uphold a finding of no disability"); *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) ("Because the ALJ neglected to engage in the proper legal standard we cannot subject his determination to meaningful review").

## V.    Discussion

Stango raises four arguments in favor of reversal or remand.  Stango's first argument is that the ALJ inaccurately characterized the medical record.  In essence, this argument is that the ALJ's decision is not supported by substantial evidence in light of her deficient review of the record. Stango's second argument is not a model of clarity.  It seems to generally take issue with the ALJ's alleged failure to assess the non-orthopedic nature of Stango's injuries.  However, upon review, the Court interprets this argument to be a challenge to the ALJ's Step Three analysis.  Specifically, the Court reads Stango to argue that the ALJ failed to properly follow the process described for determining whether his impairments meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[15]  Stango's third argument is that the ALJ's finding that his subjective complaints "are not entirely credible" is not supported by substantial evidence.  Finally, Stango argues that the ALJ violated the "treating physician rule" codified at 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

Stango thereby raises two claims of legal error—violation of the "treating physician rule" and

---

[15]  The Court comes to this interpretation in light of the fact that Stango begins this section of argument by quoting the regulations—specifically, the section containing most of the listings of impairments that the ALJ considered at Step Three—and implying that the ALJ's decision failed to comply with such regulatory requirement.  Doc. 23, at 33.

improper Step Three analysis—and two claims that the ALJ's decision is not supported by substantial evidence. As discussed below, the Court finds that Stango is correct with regards to his claims that the ALJ's decision is infected with legal error. The Court thereby need not—and cannot—make a determination as to whether the ALJ's decision is supported by substantial evidence.

### A.  Treating Physician Rule

The "treating physician rule"—codified at 20 C.F.R. § 404.1527(c)(2)— governs the weight that the SSA places on medical opinions provided by doctors that have "treated" a benefits claimant. Specifically, the regulations determine that where an opinion properly comes from a "treating source," the SSA "will give [that opinion] controlling weight." *Id.* The SSA justifies that deference because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." *Id.*

This Court recently had occasion to expound in detail upon this rule, in a case captioned *Thornton v. Colvin*, 2016 WL 525994 (D. Conn. Feb. 9, 2016). The endeavor I undertook in *Thornton* was to evaluate the Second Circuit's guidance as to the weight an ALJ must place on the opinion of a "treating physician" pursuant to SSA regulations.[16] In short, I determined that the "[treating physician] rule requires a Social Security Administration ALJ to give significant deference to the opinion of a treating physician." *Id.* at *4. Moreover, I quoted the Second Circuit's reliance on the SSA regulations, which state that if the agency decides *not* to give a treating physician's opinion "controlling weight," it "'will always give good reasons in [its] notice of determination or decision.'" *Id.* (quoting *Schaal v. Apfel*, 134 F.3d 496, 503-04 (2d Cir. 1998), which, in turn, quoted

---

[16]  The Court refers readers to §§ II & III of that decision, 2016 WL 525994, at *4-8.

the relevant regulation).  I emphasized the fact that the regulations require "[n]ot just reasons, but *good* reasons." *Id.* (emphasis in original); *see also Schaal*, 134 F.3d at 505 ("Nor does it appear that the Commissioner provided 'good reasons' for discrediting Dr. Jobson's opinion, as the 1991 Regulations require.").

In *Thornton* I quoted the regulatory requirement that "where '[the SSA] do[es] not give the treating source's opinion controlling weight,' the agency applies various factors 'in determining the weight to be given the opinion." *Id.*  The Second Circuit has identified those factors that the ALJ must consider when failing to give a treating physician controlling weight:

> In order to override the opinion of the treating physician, we have held that the ALJ must explicitly consider, *inter alia*:  (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.

*Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2003) (internal citation omitted).

Here, ALJ Griswold explicitly gave less than controlling weight to the opinions of two of Stango's treating physicians:  Dr. Maw's October 17, 2012 report, AR. 441, and Dr. Segalman's March 29, 2013 report, AR. 984.  The reports are similarly styled.  Both are one-page documents, printed on the letterhead of Stango's attorney, containing lists of symptoms next to which the physician checked a box marked either "yes" or "no." Both opinions document significant symptoms faced by Stango that attest to the severity of his conditions and their impact on his ability to function. Dr. Maw opines as to Stango's headaches, and Dr. Segalman as to Stango's ankle and foot injuries.

At the outset, I address the ALJ's reference to these opinions as "checkbox assessment[s]." AR. 20.  To the extent the format of these documents (or the fact that they were on the letterhead of Stango's attorney) influenced the ALJ's weight determination, the ALJ erred.  This issue has arisen

before, including in *Thornton*, where I discussed this issue at length.  2016 WL 525994, at *5.

There, I took the opportunity to quote an earlier opinion of mine in which I held that:

> These questionnaires, prepared by an attorney representing a client claiming social security benefits, resemble the true-false section of a bar examination rather than the essay section.  Nonetheless, the questions themselves are straightforward and do not suggest desired answers.  A physician who checks one box or another is, by that action, expressing a medical opinion.

*Id.* (quoting *Borgos-Hansen v. Colvin*, 109 F. Supp.3d 509, 516 (S.D.N.Y. 2015)).  I explained that "[a]uthority for this view is found in Judge Cabranes's opinion in *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998)," in which the panel addressed a similar checkbox assessment as to that of Drs. Maw and Segalman.  As I observed, "[t]he Second Circuit in *Schall* clearly regarded Dr. Jobson's completion of the questionnaire as the expression of a medical opinion by a treating physician." *Id.*  In line with this authority, the format of the opinions of Drs. Maw and Segalman cannot be a proper basis by which the ALJ placed no (or less than controlling) weight upon them.

I turn now to the express reasons proffered by the ALJ for her weight assessment.  The ALJ expended one sentence of reasoning as to why she disregarded Dr. Maw's opinion.  She said that "Dr. Maw does not offer a function-by-function assessment of the claimant's capabilities nor indicate a belief whether the claimant is able to work, thus, there is no weight assigned to this assessment." AR. 30.  Neither of these proffered justifications are "good reasons" for rejecting the opinion of Dr. Maw, a treating physician.  *First*, the Court is aware of no authority that determines that a treating physician's opinion should be cast aside where it does not include a "function-by-function assessment of the claimant's capabilities."  In fact, the Second Circuit has held that an ALJ has no obligation in every instance to perform a function-by-function analysis.  *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) ("remand is not necessary merely because an explicit function-by-function analysis

was not performed"); *see also Sink v. Colvin*, 2015 WL 3604655, at *17 (W.D.N.Y. June 8, 2015)

("A medical source's opinion that does not address every function with respect to physical limitations

is not invalid or insufficient. *A function-by-function analysis is unnecessary*." (emphasis added)).

If an ALJ's entire disability determination need not include a function-by-function assessment, a

treating physician's opinion—normally entitled to controlling weight—cannot be totally disregarded

for failure to perform that exercise.   Further, if the ALJ viewed the "function-by-function"

assessment as necessary, her role was to further develop the record as to Dr. Maw's assessment,

rather than to disregard her opinion entirely. *See Giebudowski v. Colvin*, 981 F. Supp.2d 765, 778

(N.D. Ill. 2013) ("[B]y failing to seek out the function-by-function analysis she found missing from

Dr. Robertson's opinion, the ALJ erred by failing to build a logical bridge between the evidence

presented and her decision to give significant weight to Dr. Jimenez's opinion and no special weight

to Dr. Robertson's.").

     *Second*, the ALJ's statement that Dr. Maw's opinion should receive no weight because she

did not "indicate a belief whether the claimant is able to work" is obvious error.   The SSA

regulations make it clear that any such statement by Dr. Maw would not even have constituted a

medical opinion.   Specifically, the regulations state that:

> (d) Medical source opinions on issues reserved to the Commissioner.
> Opinions on some issues, such as the examples that follow, *are not
> medical opinions* . . . but are, instead, opinions on issues reserved to
> the Commissioner because they are administrative findings that are
> dispositive of a case; i.e., that would direct the determination or
> decision of disability.
>
> (1) Opinions that you are disabled.  We are responsible for making
> the determination or decision about whether you meet the statutory
> definition of disability.   In so doing, we review all of the medical
> findings and other evidence that support a medical source's statement
> that you are disabled. *A statement by a medical source that you are*

*"disabled" or "<u>unable to work</u>" does not mean that we will determine that you are disabled. . . .*

*(3) We will not give <u>any</u> special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.*

20 C.F.R. § 404.1527 (emphases added).  Given this statutory and regulatory scheme, a treating physician's opinion cannot be entirely disregarded on the sole basis that the physician did not opine on an issue that the regulations state are "reserved to the Commissioner," and as to which the Commissioner will give no "special significance."

The ALJ offered only slightly more reasoning as to why she placed less than controlling weight on the opinion of Dr. Segalman.  As identical to her analysis of Dr. Maw's report, the ALJ took issue that "Dr. Segalman does not offer a function-by-function assessment of the claimant's capabilities nor indicate a belief whether the claimant is able to work."[17]  AR. 20.  As discussed above, these were not "good reasons" to disregard Dr. Segalman's opinion.  The ALJ then continued:

> However, some of the doctor's assessment is not consistent with his treatment notes and is not given significant consideration in the assigned residual functional capacity in light of the stronger well documented findings in the treatment notes.  For example, the notation that the claimant is subject to lower extremity swelling when his treatment notes consistently document no such findings. (Exhibit 16F, p.p. 3, 7, 9, and 11).

AR. 20.  This was clear error.  The ALJ claims to have identified an inconsistency between a treating physician's opinion about his patient's condition and the physician's treatment notes concerning the patient.  The ALJ then resolves that inconsistency herself.  In perceiving an inconsistency between the physician's assessment of the patient and his treatment notes, and then resolving it, the ALJ is

---

[17]  While the ALJ found those two facts to be independently sufficient for the ALJ to place "no weight" on Dr. Maw's report, she made no indication as to the specific impact this exact same set of facts had on the weight she placed on Dr. Segalman's report.

expressing medical opinions which, as a lay person, she is not competent to form.  Judge Sotomayor

made that point succinctly in *Rosa*:  "Indeed, as a lay person, the ALJ simply was not in a position

to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion

described by Dr. Ergas in his assessment."  168 F.3d at 79.  *Rosa* sets forth the Second Circuit's

instructions for ALJs confronted with a seemingly inconsistent record from a treating physician:

> If an ALJ perceives inconsistencies in a treating physician's reports,
> the ALJ bears an affirmative duty to seek out more information from
> the treating physician and to develop the administrative record
> accordingly.  In fact, where there are deficiencies in the record, an
> ALJ is under an affirmative obligation to develop a claimant's
> medical history even when the claimant is represented by counsel or
> by a paralegal.  It is the rule in our circuit that the ALJ, unlike a judge
> in a trial, must herself affirmatively develop the record in light of the
> essentially non-adversarial nature of a benefits proceeding.

*Id.*; *see also Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and

develop the arguments both for and against granting benefits."); *Burgess v. Astrue*, 537 F.3d 117,

129 (2d Cir. 2008) ("In light of the ALJ's affirmative duty to develop the administrative record, an

ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in

the administrative record" (internal quotation omitted)).

In this case, Dr. Segalman, Stango's treating podiatrist, attested to the fact that Stango is

"subject to daily lower extremity swelling secondary to post traumatic changes." AR. 984.  Pursuant

to the SSA regulations, and the Second Circuit authority interpreting same, that opinion is generally

entitled to "controlling weight."  The ALJ determined it not to be entitled to "controlling weight"

purportedly on the basis that four previous progress reports from Dr. Segalman stated "Edema: Left:

absent Right: absent."  Faced with this inconsistency—to the extent it is one at all[18]—the ALJ should

---

[18]  For one, the ALJ could have sought to supplement the record to verify her apparent
assumption that "swelling" and "edema" are in fact synonymous.  Although this is a question not

-24-

have further developed the record.  Failure to do so was legal error.

Further, the Court also notes that the ALJ erred by not expressly identifying the weight she placed on several of Stango's treating physicians to whom she did not defer.  For example, the ALJ found that "the medical record is not entirely supportive of the claimant's assertions regarding her limitations," as to "the location, duration, frequency and intensity of pain or other symptoms."  AR. 18.  However, Dr. Wetmore, Stango's treating orthopedist with whom he visited numerous times, provided his opinion to Stango that "often in musculoskeletal trauma there be chronic pain without obvious objective findings."[19]  AR. 630.  The ALJ does not mention this opinion, and thereby fails to document any reasons for discounting it in her analysis of Stango's claims of pain.

The Court thereby holds that the ALJ committed errors of law by failing to proffer "good reasons" for her decisions to give less than controlling weight to Stango's treating physicians.  The Court does not hold that the ALJ should have given those opinions controlling weight, but only that the ALJ failed to give "good reasons" for not doing so.

Whether such "good reasons" exist will be for the ALJ to determine on remand, a remedy the Court will direct.  As stated by the Second Circuit:

---

to be resolved by a lay person (such as an ALJ, or, for that matter, a district judge), a look at the Merriam-Webster dictionary definitions of the terms indicates that"swelling"— defined as "an area on someone's body that is larger than normal because of an illness or injury"— is broader than just "edema"—defined as "an abnormal infiltration and excess accumulation of serous fluid in connective tissues or in a serous cavity."  This is supported by the Mayo Clinic, which seems to define "edema" as a particular sub-type of swelling, particularly, "swelling caused by excess fluid trapped in our your body's tissues."
http://www.mayoclinic.org/diseases-conditions/edema/basics/definition/con-20033037

[19]  The ALJ also failed to address Stango's arduous medical history and recovery attempts in evaluating his pain.  It is unlikely that Stango was overstating his pain over a span of years, including multiple appointments per week, simply to deceive the SSA into giving him disability benefits.  In fact, the record shows that Stango indicated his express desire to get back to work in light of community service that he had to complete.  AR. 628.

> We do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see also Selian*, 708 F.3d at 419 ("The failure to provide 'good reasons' for not crediting the treating physician's diagnosis by itself warrants remand.")); *Golden v. Sec. of Health & Human Servs.*, 740 F. Supp. 955, 960 (W.D.N.Y. 1990) ("Where the treating physician rule has been applied incorrectly, a decision by the Secretary denying benefits cannot be upheld on the grounds that the denial is supported by substantial evidence" (citing *Johnson*, 817 F.2d at 986)). Further, it is not clear from the ALJ's opinion whether she considered the four factors an ALJ is required to assess when discounting the opinion of a treating physician. *Supra* at 20 (quoting *Selian*, 708 F.3d at 418).  The ALJ must do so on remand.

## B.  ALJ's Step Three Analysis

"At step three, the ALJ must consider whether the claimant's severe impairments meet or equal one of the enumerated disabilities listed in Appendix 1 to Subpart P of 20 C.F.R. § 404.  If so, and if the impairment is of sufficient duration, the claimant is deemed disabled and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014).  Of importance here, the ALJ must provide specific reasons why the claimant meets or does not meet an appropriate listing.  *See Berry*, 675 F.2d 464.  Specifically:

> Under the regulations, the ALJ's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs and laboratory findings about the impairment, as shown in the medical evidence, with the medical criteria as shown with the listed impairment.  *See* 20 CFR § 404.1526.  Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to

meet or equal the Listings.

*Kuleszo v. Barnhart*, 232 F. Supp.2d 44, 52 (W.D.N.Y. 2002).

As discussed, the Court interprets Stango to argue that the ALJ engaged in an improper Step Three analysis. That argument, in essence, is that by failing to address the non-orthopedic nature of Stango's injuries, the ALJ failed to properly conduct an analysis as to whether Stango's symptoms amounted to a listed impairment. This argument has merit. As shown below, the ALJ provided only perfunctory reasons as to why Stango failed to meet a listing. Therefore, the Court is unable to ascertain the basis of the ALJ's Step Three analysis, and thereby is not in a position to determine if such was supported by substantial evidence (*e.g.*, whether it ignored non-orthopedic injuries).

The ALJ's conclusory Step Three analysis is reproduced in full below:

> [T]he claimant's impairments do not meet or medically equal the criteria for Listing 1.02 (major dysfunction of a joint(s)) because there is no evidence of gross anatomical deformity. Nor do his impairments meet or medically equal the criteria for Listing 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint) because there is no evidence of surgery on a weight-bearing joint. Nor do his impairments meet or medically equal Listing 1.04 (disorders of the spine) because he does not have any of the requisite neurological deficits. (Exhibit 12F, p.p. 2-3). The claimant's representative contends that the claimant's impairments meet or equal the criteria for Listing 11.18 (cerebral trauma) and 11.00 C, persistent disorganized motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations. However, the records do not document this level of impairment.

AR. 16.

The depth of that analysis is clearly insufficient as a matter of law. The ALJ rejected as to Listing 1.02 simply because "there is no evidence of gross anatomical deformity." However, she

provided no explanation for that conclusion.  Nor did she explain why she held that conclusion to be dispositive.  This is especially problematic because the ALJ seemed to supply her own lay person definition of "gross anatomical deformity" rather than refer to the examples provided for in the regulations themselves, which are: "subluxation, contracture, bony or fibrous ankylosis, instability." Notably, Dr. Segalman, Stango's treating podiatrist, expressly opined that Stango suffered from contractures and joint instability.  AR. 984.  The ALJ's explanations as to Listings 1.03 and 1.04 are similarly sparse.  In fact, the ALJ provided precisely what one circuit has stated is "the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing."  *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015).[20]  Finally, the ALJ then provided no substantive reasons for her rejection as to Listing 11.18 and 11.00 C other than "the records do not document this level of impairment."

The Court does not presently address whether the ALJ's Step Three analysis is supported by substantial evidence.  For the reasons discussed above, that will be another task for the ALJ on remand.  It is for the Court now simply to state that if the ALJ is to adhere to her ultimate determination that Stango is not disabled at Step Three, she must, as a matter of law, provide further reasons for the determination that Stango's symptoms do not meet or medically equal a listed impairment.

---

[20] There, the ALJ's analysis was as follows:

> The claimant's degenerative disc disease was evaluated under Listing 1.04 (disorders of the spine).  The evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by that listing.

*Minnick*, 775 F.3d at 935.

## C.  Additional Considerations

For the reasons discussed, a district court may not assess objections as to "substantial evidence" where an ALJ decision is infected with legal error. *Johnson*, 817 F.2d at 986; *Tejada*, 167 F.3d at 773.  The reasons for such are apparent in a case such as this.  The ALJ's assessment of Stango's credibility as to his headaches is a notable example.  The ALJ did not fully credit Stango's subjective testimony as to the debilitating effect of his headaches because "[t]reatment notes . . . do not describe headaches of the severity, duration, or frequency as testified to at the hearing."  AR. 18 (citing AR. 447-58 (treatment notes which do state that "headaches are milder now, tolerable," but also state that they are "almost daily," "continue despite treatment," and "can last for hours.")).  However, the ALJ's assessment is in seeming contradiction to Dr. Maw's medical opinion, which is that Stango suffers from severe headaches typically lasting longer than two hours at least twice a week that cause him to "lie recumbent & undisturbed until headache subsides."[21] AR. 441.  Dr. Maw also opined that the headaches are associated with dizziness, vertigo, photophobia, and noise sensitivity.  AR. 441.  Moreover, Dr. Maw determined that Stango's complaints are consistent with clinical findings, and that, nevertheless, "the unavailability of objective testing measures for headache pain [does not] mean that pain is not real."[22] AR. 441.  In short, Dr. Maw's opinion seems to directly support Stango's subjective testimony.  However, the ALJ disregarded this evidence.  As discussed *supra*, she did so in violation of SSA regulations, an error of law that may have left the

---

[21]  As discussed, *supra* n. 7, there is a seeming contradiction within Dr. Maw's report that may or may not be the result of a clerical error.  Such inconsistency was not a basis for the ALJ's discrediting of Dr. Maw's opinion.  To the extent the ALJ views such as an inconsistency on remand, she should supplement the record in a similar fashion as the Court described in connection with Dr. Segalman's report.

[22]  This finding is consistent with that of Dr. Wetmore, who told Stango that "often in musculoskeletal trauma there can be chronic pain without obvious objective findings."  AR. 630.

record incomplete.  Therefore, because the ALJ may have improperly ignored evidence that SSA regulations deem to be highly relevant to a disability determination, this Court is not in a position to determine that substantial evidence exists to support her finding that Stango's testimony is not credible.[23]

Likewise, in light of the potential deficiencies in the record, the Court is not presently able to assess the merits of Stango's other claims that the ALJ generally mischaracterized the record.  The Court acknowledges that the medical record in this case contains apparently conflicting reports of Stango's condition, explained most probably by the ebb and flow of Stango's symptoms.  The Court further acknowledges that such "genuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) ("we [the Second Circuit] are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony").  Moreover, "when 'there is substantial evidence to support either position, the determination is one to be made by [the] factfinder,' . . . and

_____

[23] The Court does note for assistance on remand that certain of the ALJ's credibility analysis is spurious. *First*, she stated that the fact that Stango "stopped working in January 2009 due to a business related layoff not due to his allegedly disabling impairments . . . does not enhance the credibility of his claims of disabling physical and mental symptoms." AR. 18. This seems to the Court to be an entirely speculative assumption upon which to base a credibility determination.  The ALJ did not proffer this line of inquiry to Stango at the hearing, nor did she seem to base her assumption on any piece of objective or subjective evidence. *Second*, the ALJ stated that "claimant's account of his accident to his neurologist was inconsistent with the initial report documented at the emergency room which does not assist his credibility." AR. 18 (citing AR. 312, 430).  The only plausible inconsistency here is a statement by Dr. David Knight at the Waterbury Hospital that "[p]er patient, after the accident his right leg was pinned underneath his motorcycle," AR. 312, with a statement by Dr. Novella four months later that Stango "was ejected several yards away from the site," AR. 430.  One, it's not clear exactly if those statements are in fact inconsistent.  Two, Stango did not make those statements; and, Dr. Novella's statement does not even purport to come from Stango (*i.e.*, perhaps Dr. Novella misread a report from Waterbury Hospital).  Three, the ALJ made no reference to this supposed inconsistency at the hearing, nor did she ever elicit input as to this purported inconsistency from either Drs. Knight or Novella.  In short, this is a weak basis upon which to question Stango's credibility.

we may not overturn such a determination." *O'Connor v. Chater*, 1998 WL 695418, at *1 (2d Cir. Sept. 25, 1998) (quoting *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). This is the necessary outcome of the "very deferential standard of review" applied to social security disability appeals. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).

However, for the reasons discussed *supra*, this Court is unable to apply such deference to an ALJ decision, such as the one under review, that stems from a record left incomplete due to erroneous applications of law. *See Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) ("Because the ALJ neglected to engage in the proper legal standard we cannot subject his determination to meaningful review"). Therefore, it will be for the ALJ on remand to reevaluate her assessment of Stango's condition, but only after ensuring that the record is complete and is compiled in compliance with applicable law.

## VI.   Conclusion

A remand to the Commissioner is necessary in this case because there are gaps in the administrative record arising from errors of law. One such gap relates to the reasons for disregarding the opinions of two of Stango's treating physicians. The justice of the cause requires an order that the ALJ be directed to conduct any such further investigation into the opinions of Stango's treating physicians as the ALJ may think appropriate, given the contents of this Ruling. The other gap relates to the reasons the ALJ gave for finding that Stango's severe impairments did not "meet or medically equal" an impairment listed in the SSA regulations. The justice of the cause requires the ALJ to rectify that deficiency as well.

Once those gaps become filled, it will then be for the ALJ to re-engage in the SSA's familiar five-step process in light of any new evidence or determinations, if any, that were improperly

excluded from her earlier analysis.

For the foregoing reasons, the motion [Doc. 22] of the Plaintiff for an order reversing or remanding the decision of the Defendant Commissioner is GRANTED IN PART and DENIED IN PART.  The motion is granted to the extent that the Court remands this case to the Commissioner for further proceedings consistent with this Ruling.

The cross-motion [Doc. 27] for an order affirming the decision of the Commissioner is DENIED.

The Clerk is directed to close the case.

**It is SO ORDERED.**

**Dated: New Haven, Connecticut**
          **June 17, 2016**

                                          */s/ Charles S. Haight, Jr.*
                                          **Charles S. Haight, Jr.**
                                          **Senior United States District Judge**